[No. 3266.]

W. H. Frazier, *alias* Robinson, *v.* The State.

1. Theft — Possession — Ownership.— Two classes of "ownership" are provided by the statute with reference to property which may be the subject of theft; first, a general, and second, a special ownership; and both of these classes, in so far as the offense of theft is concerned, depend upon "possession." In fact, under our statutes upon the subject of theft, "ownership" and "possession" are, in this respect, synonymous or convertible terms, meaning one and the same thing.

2. "Possession," as defined in the Code, is of two-fold character. First, it may be in the actual owner, who is the general owner, and second, it may be in some person holding the property for the actual owner, who is the special owner.

3. Same — Definition of a Term.— It is not, under the statute (Penal Code, article 728), necessary that, to constitute theft, the possession and actual or general ownership should be in the same person, at the time of "the taking." It is necessary, however, under article 724 of the same Code, that "the taking" should be without "his consent." But this does not mean the *actual* owner's consent, unless he was in "possession" at the time of "the taking." If he was not in possession at that time, then the terms "without his consent" mean without the consent of the special owner, *i. e.,* the person in possession,— referring more specially to possession rather than ownership.

4. Same — Case Overruled.— Defining "possession," as that term is used in our statutes upon theft, the Penal Code, article 729, provides as follows: "Possession of the person so unlawfully deprived of property is constituted by the exercise of actual control, care *or* management of the property, whether the same be lawful or not." *Held,* that under the proper rules of statutory construction, as laid down in Bishop's Statutory Crimes, section 543 (and set out at length in the opinion), the use of the disjunctive "or" (italicised herein) was an inadvertence on the part of the codifiers, and was so used in the stead of the intended conjunction "and." See the opinion *in extenso* on the question; and note, also, that in so far as it holds that the temporary use and custody of the property as a servant, subordinate to the owner or person having the actual care, control and management of the same, will support an allegation of possession or ownership, the case of *Erskine* v. *The State*, 1 Texas Ct. App., 405, is overruled.

5. Same — Pleading — Evidence — Cases Overruled.— Though article 426 of the Code of Criminal Procedure authorizes, in theft cases, the allegation of ownership to be in either the actual or the special owner, it is the better practice in most instances to allege the ownership to be in him who has the actual charge, control and management — in short, the possession — of the property. Contrary to this doctrine, the cases of *Erskine* v. *The State, supra; Jackson* v. *The State*, 7 Texas Ct. App., 363; *Wilson* v. *The State*, 12 Texas Ct. App., 481; *Bowling* v. *The State*, 13 Texas Ct. App., 338, and *Williamson* v. *The State*, Id., 514, announce the following rule: "Whenever one person owns the property, and another person has the management, care or control of it, the want of the consent of each of these persons must be proved; and this proof should be made by the persons themselves if they are attainable, and if they are not to be had, their absence should be accounted for before the

State can be allowed to resort to circumstantial evidence." The cases named are overruled on this point. See the opinion *in extenso* on the whole question.

6. THEFT — CHARGE OF THE COURT — CASE STATED.— The indictment alleged the theft of the property of W. without the consent of the owner, and with intent, etc. W. testified that the property belonged to a minor child of P., both of whom lived with the prosecutor W.; that he had the general, exclusive control and management of the property. Neither the want of the consent of the minor, the actual owner, nor that of her mother, her natural guardian, was proved. The trial court charged the jury, in effect, that if the property was taken from the possession of W., without his consent, and he, at the time, had the care, control and management of the property, that would be sufficient as to ownership and want of consent. *Held*, correct.

7. NEW TRIAL.— NEWLY DISCOVERED EVIDENCE will not authorize the award of new trial, when it appears that due diligence was not used to secure it on the original trial.

APPEAL from the District Court of Lampasas. Tried below before the Hon. W. A. Blackburn.

The appellant was charged by indictment at the June term, 1884, of the district court of Lampasas county, with the theft of a horse, the property of A. G. Wheeler. The offense was alleged to have been committed on the 29th day of January, 1884. At the December term, 1884, the defendant was tried and convicted and sentenced to the penitentiary for the term of five years.

T. S. James was the first witness for the State. He testified that he lived near Williams's Ranch in Brown county, Texas, on the 8th day of January, 1884. In his search for some of his missing stock on that day, the witness struck the trail of a drove of horses six miles from San Saba Peak, in Lampasas county. About a mile and a half beyond, a wagon track came into the trail of the horses. The witness followed the trail of the wagon and the horses some thirty or forty miles. The general course of the trail followed by the witness was a little north of east. On Sunday, January 9, 1884, witness came in sight of the wagon and horses, which were in charge of seven men. Supposing the men to constitute one gang, the witness did not go up to them, but passed on. After a little time he met Messrs. Bittick, Curtis, Carson and his son, and ascertained from them that they were of the party of seven men the witness saw in charge of the horses. With these gentlemen the witness went on to a point near Mr. Gholson's house, where, in due course of time, they were overtaken by the wagon and horses, in charge at that time of but two men, the defendant and one John Moore. A woman and several children were in the wagon. Witness and his party joined and rode along with defendant and Moore

to a point near Langford's Cove, where the horses were penned. Defendant said that his name was Robinson. Witness asked the defendant if he could look through and examine the horses, and defendant referred the witness to the woman, and she consented. Witness looked through the horses, but found none that belonged to him. He was about to rope one of the animals when defendant directed that the horses be turned out; which was accordingly done. Among the horses in the lot was a grey, branded S Y on the shoulder and L V on the thigh. The other horses examined by witness were branded ᴄHD, connected, which brand was a recent change from what was known as the "flying H brand." The crisp burnt and singed hair was still visible. Soon after leaving the pen, the witness and his party arrested the defendant and Moore, and took them to Senterfeit, Lampasas county. When he was arrested the defendant gave William H. Frazier as his correct name. This arrest was made on Sunday, January 9, 1884, and their examining trial was had on the following Wednesday. Witness had previously seen animals in the "flying H" brand on the San Saba Peak range. Mr. Watson of Burnet came to Senterfeit and claimed, proved and recovered eleven head of the horses.

John Bittick was the next witness for the State. He testified that on the Friday before the arrest of the defendant and Moore, between sunset and dark, he, while horse hunting, encountered them near San Saba Peak in Lampasas county, driving a good bunch of horses in a trot. Witness asked if they had seen the horse he was hunting, which he described to them, and both answered that they had. In this connection the defendant said: "We are from Mason county. We are taking some horses to Cherokee county, to trade for cattle. We lost some of our horses and have been looking for them. Our camp is not very far off." Witness looked for the camp of these parties on the next day, but failed to find it. On the morning of Sunday, January 9, 1884, witness went with the Carsons, senior and junior, and Curtis in search of these horses. They came in sight of the camp after traveling some ten miles. The Carsons and Curtis stopped at a house near by, and the witness went on to the camp. *En route* from that house to the camp the witness met a man who said that his name was Meers, but whose real name, as witness has since ascertained, was Black Burt, and engaged him in conversation. Burt said that witness was at perfect liberty to examine his horses. Witness returned to the house for the Carsons and Curtis, who went with him to the camp. Defendant and Moore galloped to meet witness and his

party, and afterwards rounded up some of the horses for inspection. Burt, mounted on a bay mare branded B U D, rode around the horses, exhibiting them. Burt claimed to own them. Among these were three horses which were among those driven by defendant and Moore on the Friday before. These were a sorrel mare, a one year old colt, and a two year old colt, all branded αHD, connected, which was a recent alteration from the "flying H" brand.

Among the horses the witness saw a grey one, branded S Y on the right shoulder and L V on the right thigh. Among them, also, he saw a black or dark brown horse that was hoppled, of which horse the witness knew the owner. Burt said that this hoppled horse had come voluntarily to his camp; that he did not claim him, but did claim the others. Witness knew the grey horse as Mr. Wheeler's, and five or six days before had seen him on the range in Lampasas county. Frazier made no claim to the grey Wheeler horse, nor any other horse of the bunch save a small grey horse he was riding. Some three or more months prior to this time witness saw the man Burt near San Saba Peak. He was then known as Moore. Witness and his party, finding none of their animals among the horses, left, going to Gholson's house, where, after a time, the defendant Moore, the wagon with the woman and the children and the bunch of horses arrived. Burt did not go to Gholson's house, but the bay mare he had ridden that morning was among the horses. The black or brown horse that was hoppled near their camp was not in the bunch. Mean time Mr. James had joined the party, and after the horses were penned asked permission to examine the horses. Defendant replied that he had nothing to do with it, and that James would have to ask permission of the woman. This permission the woman granted. After one or two horses had been examined, either the defendant or Moore demanded that the horses should be turned out. This was accordingly done, and the witness and the party with him followed to Senterfeit, where they arrested defendant and Moore.

A. P. Carson was the next witness for the State. He testified that he was one of the parties who trailed the defendant, Moore and the bunch of horses from San Saba Peak. In company with his son, Mr. Curtis and Mr. Bittick, he found the camp on Sunday. Bittick alone went to the camp at first, returned and reported that he had the permission of the man in charge to look through the bunch. The party then started to the bunch, and saw the defendant and Moore mount their horses and ride rapidly away from the camp, as the witness presumed, to drive off some of the horses. The

witness and his party overtook defendant and Moore, who rounded up some of the horses and took them to the camp. Defendant said that the man at the camp owned the horses; that he was working for the man, but did not know his name, though he thought it was More. He said that his own name was Robinson, and Johnny Moore, his companion, claimed the name of Sharp. The name of the man at the camp, as the witness had since learned, was Burt, and he was generally called "Black" Burt. Among the horses the witness saw a black or dark brown hoppled horse, which Frazier said they did not claim, but did claim the others. Witness thought it somewhat strange that the black horse should take up so readily with strange stock. As the party were entering the camp, Burt stepped out from the brush, and asked what was wanted. Witness replied that they wanted to examine that bunch of horses, and that if any stolen animals were found among them they wanted him and his associates and the horses; otherwise they wanted nothing. Burt said that he owned all except the hoppled horse. Several horses of the bunch were branded ⊐нᴅ, which had been recently changed from some other brand. When the party, having examined the horses, got back to camp, they saw Burt standing by his horse, fingering the hammers of his gun. He remarked that the witness and his companions were making themselves rather busy about his affairs. The witness saw the grey horse, described by other witnesses, in the bunch. From this camp witness and his party went to Gholson's house, where in the course of time they were joined by the defendant and Johnnie Moore, the wagon with the woman and children, and the horses. Burt was not along. Witness and his party followed defendant and Moore, arrested and took them to Senterfeit.

J. W. Watson testified, for the State, that he lived at Burnet, Texas, and was formerly a member of the firm of Hudson & Watson, the owners of a stock of horses in the "flying H" brand. Witness was present at Senterfeit at the examining trial of the defendant. Among the horses, for the theft of which the defendant was then charged, the witness identified eleven that belonged to Hudson & Watson. The Hudson & Watson brand on them had been recently changed to ⊐нᴅ. They were part of a lot that escaped from a drove which Hudson & Watson started to their ranch in Coleman county, in 1883. Witness took possession of the said eleven head of horses.

W. W. Hubbard testified, for the State, that he formerly worked for the firm of Hudson & Watson, the owners of the "flying H" brand of horses. In August or September, 1883, witness took a large number of those horses from Lampasas county to the Coleman

county ranch of the owners. Some of the horses he started with were lost on the way. Witness went with Mr. Watson to Senterfeit, and, on the examining trial of defendant, identified some of the horses which he lost in his drive from Lampasas to Coleman county. The original brand had been recently changed to ꭰⅢ𝐃. Among those so recognized by witnesses was a sorrel mare and sorrel colt, which he knew perfectly well by their flesh marks. Witness had long been in the employ of Hudson & Watson, and was perfectly familiar with their stock.

A. G. Wheeler testified, for the State, that he lived near Senterfeit in Lampasas county. He was present at the examining trial of defendant. Among the horses which had been found in defendant's possession was a grey animal branded S Y on the left shoulder and L V on the left thigh. Witness took that horse home. The witness had given the dam of that horse to the daughter of Mrs. Sylvia Pickett, a lady who kept house for him. The animal was in Mrs. Pickett's brand, and was under the exclusive management, care and control of the witness, and was taken from his possession without his knowledge or consent. The State closed.

J. M. Forehand, the cousin of the defendant, was the first witness in his behalf. He testified that he lived at Senterfeit in Lampasas county. The defendant came to witness's house some time in November, 1883, and witness employed him to go to his ranch in Coleman county, to work. A day or two after Christmas defendant arrived at witness's house in Senterfeit and asked for a settlement, saying that he was going to Ellis county to see his people. Witness settled with him, but asked him to delay his departure for Ellis county long enough to assist his son Bud to kill some hogs. He and Bud left Senterfeit to go to Bud's house, about three days after Christmas, and witness saw no more of defendant until after his arrest. Defendant, in December, 1883, owned a grey pony, for which he had traded in Coleman county.

Bud Forehand testified, for the defense, that defendant and he worked on Forehand's ranch in Coleman county in December, 1883. On the day after Christmas of that year, defendant and witness returned to witness's father's house in Lampasas county. Witness's father settled with defendant, who said that he was going to Ellis county to see his mother. He went, however, with witness to his place in Lampasas county, near San Saba Peak, to kill hogs, and left that place, saying that he was going to Ellis county. Witness left next day for Coleman. Witness at no time had seen the defendant in company with a man named Meers or Burt.

Le Roy Beck testified, for the defense, that he lived near San Saba Peak in Lampasas county. He knew a man in that neighborhood during the fall of 1883, who called himself Meers. He owned or was in possession of a small stock of horses. Witness suspected him then of nothing wrong.

Matt Roach testified, for the defense, that he was the justice of the peace who presided over the examining trial of the defendant. Witness at that time issued a warrant for the arrest of the man Meers, whom he afterwards learned was Black Burt. Shortly after this the witness received a telegram from the sheriff of Callahan county, to the effect that he had Burt in custody, badly wounded, and asking what to do with him. A day or two later the sheriff wired witness: "Burt is dead," and witness replied: "Bury him there."

Mrs. L. M. Burt, the wife of the deceased Black Burt, testified, for the defense, that she was near San Saba Peak with Burt in December, 1883. She saw the defendant for the first time on the 29th or 30th day of that month. She heard Burt tell defendant that he was driving the stock of horses to an eastern county, and would travel the prospective route of the defendant; that, if defendant would keep about the horses on the way, he, Burt, would bear his expenses to his place of destination, and that, if defendant proved a satisfactory hand, he, Burt, would employ him at $30 per month. Defendant agreed, and he and Johnny Moore, witness's brother, helped about the horses until their arrest about ten days later. Burt alone, in the absence of defendant and Moore, changed the brand on two or three of the horses. Burt was afterwards killed in Callahan county.

The questions discussed in the opinion arose upon one of the grounds assigned for new trial.

*Mathews & Wood* filed an able brief for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

White, Presiding Judge. Inasmuch as so much trouble and vexation occurs in a majority of prosecutions for theft with regard to "ownership," "possession," and "want of consent," we propose now, in connection with the recent opinion of Judge Hurt, delivered at the present term in the case of *Bailey* v. *The State (ante,* p. 426), to further elaborate these questions with a view of relieving them of many of the difficulties by which, whether from confusion in the

decisions of our courts, or misapprehension of the proper construction of our statutes, they have become seemingly environed.

With regard to property which may be the subject of theft, there is provided, under the statute, two kinds of ownership, viz.: 1, a general, and 2, a special ownership, both of which depend upon "possession" alone so far as this offense is concerned. We will also see as we proceed that really "ownership" means nothing more than "possession," and that ownership and possession are but synonymous or convertible terms under our statutes on the subject of theft.

As defined in the Code, this "possession" is of a two-fold character. 1. It may be in the actual owner, who is the general owner; or, 2, it may be in some person holding the property for the actual owner,— who is the special owner. It is not necessary that the possession and actual or general ownership should be in the same person at the time of "the taking" to constitute theft. (Penal Code, art. 728.) It is necessary, however, in the language of the statute, that the taking should be "without his consent." (Penal Code, art. 724.) Whose consent — the owner's? Not necessarily, unless the actual owner was in "possession" at the time of "the taking." If he was not in possession at that time, then the terms "without his consent" mean without the consent of the special owner — that is, the person in possession. "Without his consent" refers specially to possession rather than ownership. Now, who is the person in "possession?" This is answered by the statute, which declares that "Possession of the person so unlawfully deprived of property is constituted by the exercise of actual control, care *or* management of the property, whether the same be lawful or not." (Penal Code, art. 729.) The use of the disjunctive "or" in this provision of the statute has created no little of the trouble which has been experienced on this subject. Evidently the conjunction "*and*" was intended and should be used in its stead, in giving it proper construction.

Mr. Bishop says: "However desirable a correct use of the English language may be, the courts have no jurisdiction to enforce it on the Legislature. Therefore, when the legislative meaning is plain, the exact grammatical construction and propriety of language may be disregarded, even in a penal statute. For example: the conjunction "and" will be read as "or," and "or" as "and," when the sense obviously so requires; and this in plain cases, even in criminal statutes against the accused." (Bish. Stat. Crimes (2d ed.), § 243.)

Manifestly it never was intended that a person who was "caring" for a horse, for instance,— one who is simply feeding and currying

him as an ostler in a livery stable — was to be held in such posses-
sion and ownership as that the horse, when stolen from the stable,
could be said to have been taken from his possession. And the
same with regard to the driver of an omnibus or wagon, who was
controlling and managing the horse for the purpose of working him.
Such persons have only temporary custody and use of the animal
as servants of and subordinate to the owner or person having the
actual care, control and management of the same. Their possession
is not necessary to and will not support an allegation of possession
or ownership. We are aware that Erskine's case, 1 Texas Ct. App.,
405, holds otherwise, but it will be overruled upon this point.

With regard to the pleading in theft, it is expressly provided that
" where one person owns the property, and another person has the
possession, charge or (and) control of the same, the ownership thereof
may be alleged to be in either." (Code Crim. Proc., art. 426.) It
" may be alleged to be in either,"— that is, it may and in most in-
stances should only be alleged to be in one, and that one should be the
one having the actual charge, control and management. It is not in
such cases necessary to allege ownership in the actual or general
owner; the special owner is the one from whose possession the prop-
erty is actually taken, and it is only necessary to allege a taking
from him, and that it was without his consent. In other words, as the
criterion in determining how ownership should be alleged, it should
first be ascertained who was in " the exercise of actual control, care
and management," at the time the property was taken. If the
actual owner, then " the possession " was in him, and should be so
alleged, though he may have agents or servants using the property
at the time in subordination to his possession. But if the "actual
control, care and management " at the time of the taking is in an-
other, then this other is the special owner in " possession," and it is
his possession which has been despoiled, and the property should be
alleged to be his and taken from his " possession " and " without his
consent," without any mention of the actual or general owner —
because the property was not " taken " from the latter's " posses-
sion." What constitutes the control, care and management of prop-
erty must depend upon the circumstances of the particular case, in
many instances.

Proof must be made that the property was taken from the pos-
session of the party in whose possession it was alleged to be. If
the owner was not in actual possession, but another was, then, if the
allegation placed it in the owner and the proof showed it in another
who had the " actual control, care and management," then the vari-

ance between the proof and the allegation would be fatal, and a conviction could not be had.   Let us illustrate the whole matter by actual instances which may occur at any time.

1. Suppose A., who is a non-resident, or resides in say Galveston county, is the actual owner of a stock of cattle or horses in Tom Green county or the Panhandle, which stock is under the actual control, care and management of B.   One of the animals is stolen.   The indictment should allege the ownership in B. alone, and it is, so far as consent is concerned, only necessary to allege and prove B.'s want of consent.   Such allegation and proof fully makes out the State's case.   If, under such circumstances, the accused has the consent of the real, actual or general owner, then it is his business to show it. For, "on the trial of any criminal action, when the facts have been proved which constitute the offense, it devolves upon the accused to establish the facts and circumstances on which he relies to excuse or justify the prohibited act or omission."   (Penal Code, art. 51.) The State was not bound to allege, neither was it bound to prove, the want of consent of the real owner.

In Erskine's case, *supra*, and in Jackson's case, 7 Texas Ct. App., 363; Williamson's case, 13 Texas Ct. App., 514; Wilson's case, 12 Texas Ct. App., 481, and Bowling's case, 13 Texas Ct. App., 338, it is held, as is expressed in the opinion in several of these cases, that "whenever one person owns the property, and another person has the management, control or care of it, the want of the consent of each of these persons must be proved; and this proof should be made by the persons themselves if they are attainable, and if they are not to be had, their absence should be accounted for before the State can be allowed to resort to circumstantial evidence."   Under the views and reasons above expressed, such is not the law, and the doctrine thus announced in those cases is overruled.

2. Again: Suppose A. owns a horse, and he loans or hires it for a week to B., and it is taken from the possession of the latter.   The ownership, possession and want of consent may be averred in B. alone or ownership may be averred in A., possession in B., holding the same for A., and without B.'s consent.   This would be sufficient, and want of consent of both A. and B. would have to be so proven.

3. Suppose A. loans his horse to his son or servant to ride, or he sends them on the horse on his business, temporarily to town or church, and the horse is taken.   In such case the possession is in A., and it is unnecessary to allege that the horse was taken from the son or servant, because their control and possession was simply subordinate to the superior possession of A.

4. Suppose A. is a minor and his horse taken; the possession may be alleged in whomsoever has the actual care, control and management of the horse.

In the case we are considering — the one in hand — Frazier was charged with the theft of a horse alleged to be the property of A. G. Wheeler, without the consent of the owner, and with intent, etc. Wheeler's testimony was that the horse was the property of a minor child, the daughter of one Sylvia Pickett, both of whom lived with the prosecutor Wheeler; that he, the prosecutor, " had general, exclusive control and management of this horse."   Neither the want of consent of Sylvia Pickett, the mother and natural guardian of her minor child, nor that of the child itself, who was the real, actual owner, was proven.   In the charge submitted by the court to the jury, they were in effect instructed that, if the property was taken from the possession of Wheeler and without his consent, and he at the time had the care, control and management of the property, that would be sufficient as to the ownership and want of consent. It is claimed that the charge is erroneous, and that the proof was insufficient as to want of consent, and was variant from the allegation as to ownership.   Neither of these positions is well taken under the principles of law as we have herein announced them. The charge of the court was correct, and there was no error in refusing defendant's special requested instructions.

Defendant's motion for a new trial, based upon newly discovered evidence, is entirely wanting in diligence, and it was not error to overrule it.   If the proposed evidence was true, proper diligence would have disclosed that Mrs. Burt, who testified in the case, could have proven the same facts.

We have found no error in the proceedings on the trial of the court below, and the judgment is therefore affirmed.

*Affirmed.*

[Opinion delivered June 10, 1885.]